DANIEL G. BOGDEN
United States Attorney
J. GREGORY DAMM
NICHOLAS D. DICKINSON
Assistant United States Attorney
Organized Crime Strike Force
Lloyd D. George United States Courthouse
333 Las Vegas Boulevard South, Room 5037
Las Vegas, Nevada 89101
(702)  388-6336/Fax: (702) 388- 6418

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA
### -oOo-

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | 2:09-cr-00078-JCM(RJJ) |
| vs. | ) | MEMORANDUM IN SUPPORT |
| | ) | OF GUILTY PLEA WITHOUT |
| SAMUEL DAVIS, | ) | PLEA AGREEMENT |
| Defendant. | ) | |

The United States, by and through Daniel G. Bogden, United States Attorney, and J. Gregory Damm and Nicholas D. Dickinson, Assistant United States Attorneys, Organized Crime Strike Force, submit this Memorandum to aid the Court in advising Defendant Samuel Davis of the consequences of a guilty plea under Fed.R.Crim.Pro. 11(a)(2)(c).

**I.**

**NO PLEA AGREEMENT**

There is no plea agreement in this case.  Government's counsel was informed by defense counsel that defendant intends to change his plea of not guilty to guilty without the benefit of a plea agreement.

. . .

The defendant is charged by Indictment with one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h) - (Count 1) and thirty counts of Money Laundering, in violation of 18 U.S.C. § 1956(a)(1) and (3) - (Counts 2-31).

## II.

## PENALTY

1.  The maximum penalty for a violation of Title 18 United States Code, Section 1956(h) and for each violation of Title 18, United States Code, Section 1956(a)(3) is not more than 20 years imprisonment, a fine of not more than $250,000, or both.

2.  The defendant is subject to supervised release for a term of not more than three years. Supervised release is a period of time following imprisonment during which the defendant will be subject to various restrictions and requirements. The defendant understands that if the defendant violates one or more of the conditions of any supervised release imposed, the defendant may be returned to prison for all or part of the term of supervised release, which could result in the defendant serving a total term of imprisonment greater than the statutory maximum stated above.

3.  The defendant must pay a special assessment of $100 for each count of conviction.

4.  The defendant is required to pay for the costs of imprisonment, probation, and supervised release, unless defendant establishes that the defendant does not have the ability to pay such costs, in which case the court may impose an alternative sanction such as community service.

## III.

## SENTENCING GUIDELINES

1.  The defendant understands that the court is required to consider United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") among other factors in determining defendant's sentence. The defendant understands that the Sentencing Guidelines are advisory, and that after considering the Sentencing Guidelines, the court may be free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crimes of conviction.

. . .

2. The sentence imposed will be under 18 U.S.C. § 3551 *et. seq.* and the Sentencing Guidelines. The length and terms of that sentence depend upon the nature and extent of previous criminal convictions which determine the offense level and criminal history category. The Court determines the offense level and criminal history category, and then must impose a reasonable sentence.

3. The defendant's Criminal History Category will be determined by the Court.

## IV.

## RESTITUTION

Under both 18 U.S.C. § 3663 and U.S.S.G. § 5E1.1, the defendant is subject to restitution in an amount to be determined by the Court. Any restitution imposed by the Court may not be discharged in whole or in part in any present or future bankruptcy proceeding.

## III.

## ELEMENTS

1. The elements of proof for conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h) are the following:

First, that from on or about September 20, 2008, and continuing up to an including March 3, 2009, the defendant and at least one other person agreed to commit at least one of money laundering crimes alleged in the Indictment, and;

Second, that the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

2. The elements of proof for money laundering, in violation of Title 18, United States Code, Section 1956(a)(3) are the following:

First, the defendant conducted or intended to conduct a financial transaction involving property that was represented to be the proceeds of specified unlawful activity;

Second, the defendant knew that the property represented the proceeds of specified unlawful activity; and

Third, the defendant acted with the intent to promote the carrying on of specified unlawful activity or knowing that the transaction was designed in whole or part to conceal or disguise the nature, location, source of ownership or control of the proceeds of specified unlawful activity.

A financial transaction is a transaction involving: the movement of funds by wire or other means; one or more monetary instruments; or, the use of a financial institution which is engaged in interstate or foreign commerce or the activities of which affect interstate or foreign commerce in any way.

## IV.

## **FACTS TO SUPPORT A PLEA OF GUILTY**

1.      Beginning in or about March, 2008, and continuing through March 3, 2009, special agents of the Federal Bureau of Investigation, acting in an undercover capacity, met with defendant Samuel Davis and represented to Davis that they were involved with individuals who were engaged in bank fraud in violation of Title 18, United States Code, Section 1344, a specified unlawful activity as defined by Title 18, United States Code, Section 1956(c)(7)(A). The undercover agents explained they were involved in the theft and forgery of stolen official checks from Wachovia Bank and showed Davis what the undercover agents represented as some of the official checks stolen from Wachovia Bank.  The undercover agents expressed to Davis that they desired a mechanism to launder their proceeds from the bank fraud more quickly.  Davis told the undercover agents that he could launder the proceeds of the bank fraud easily, and that he had engaged in money laundering in the past. Davis told the undercover agents that the money would originate in the undercover agents' financial account, then pass through one or more financial accounts of various trusts and corporations controlled by Davis.  Davis would then return the proceeds of the bank fraud to the undercover agents' financial account.  Davis said he would then further launder the proceeds of the bank fraud by disguising the proceeds as loans.  Davis explained  that the money would not be subject to tax liability, and that the loans would be concealed by having all parties involved sign non-disclosure agreements.

. . .

2.      To accomplish the laundering of the proceeds, Davis agreed to and received $10,000 from the undercover agents, which the undercover agents represented as the proceeds of bank fraud. This money was to cover the costs of creating any trusts and corporations that Davis would use to "wash" the proceeds.  As additional compensation for the laundering of the proceeds, Davis also agreed to receive ten percent (10%) on the first $200,000 the undercover agents wire transferred to him to be laundered. Subsequently, Davis arranged for the undercover agents to wire transfer money, represented to be the proceeds from bank fraud, to Wells Fargo account number XXXXXX5202 in the name of Boulder Mountain Funding Trust.  Davis would then wire transfer the money back the to undercover agents' financial account minus any fee for Davis's services.  From March 2008 through on or about September 9, 2008, undercover agents wire transferred approximately $585,000 to Samuel Davis.  Davis wire transferred back approximately $540,000 to the undercover agents through their financial account, and kept $45,000 as payment for his money laundering services.

3.      Beginning in or about September 2008, the undercover agents told Davis that the proceeds represented to be the product of bank fraud were no longer available to Davis for laundering through the use of wire transfers between financial institutions.  The undercover agents told Davis that the proceeds of the bank fraud were now available only in cash.  To assist with the laundering of currency which the undercover agents represented to be from bank fraud, Davis obtained the assistance of his associate, Shawn Rice.

4.      In or about September 2008, Davis arranged for himself and Rice to meet an undercover agent in the State of Nevada to discuss how to launder the bank fraud cash proceeds. Beginning in or about September 2008, the undercover agent again represented to Rice that he was involved with individuals who were engaged in bank fraud, in violation of Title 18, United States Code, Section 1344, a specified unlawful activity as defined by Title 18, United States Code, Section 1956(c)(7)(A). The undercover agent explained that he was involved in the theft and forgery of stolen official checks from Wachovia Bank and showed Rice what the undercover agent represented as some of the official checks stolen from Wachovia Bank.  The undercover agent subsequently advised Rice

that his contact at Wachovia Bank, who was stealing the blank official checks and signature stamps, was getting transferred to the same department at Wells Fargo Bank, and would be in a position to steal these same items at Wells Fargo Bank.

5. Rice proposed several options to launder the cash proceeds including moving the currency into J.P. Morgan Chase Bank of Arizona through his purported religions organizations, i.e, "The Oder of Gershom" or "Simpe." Rice explained to the undercover agent that he could take the cash proceeds and deposit them into his bank account as charitable donations because he claimed he was a rabbi. Rice further explained if he were stopped by police and questioned about his possession of a large amount of cash, he would tell the police the money was religious donations. Rice stated that after he deposited the money in his personal account, Rice could then transfer the money to the undercover agent's financial account. Rice agreed to launder the cash proceeds the undercover agent represented to be the proceeds of bank fraud for a three percent (3%) commission.

6. Beginning in or about October 2008, the undercover agent would meet with Rice in the State of Nevada and provided Rice with cash which the undercover agent represented to be the proceeds of bank fraud. Rice would subsequently deposit the currency in his Simpe account at J.P. Morgan Chase Bank, account number XXXXX4312, and then purchase a cashier's check and deposit the check back into the undercover agent's financial account in the State of Nevada. Rice opened the SIMPE account at J.P. Morgan Chase Bank under a false Social Security Number not assigned to him. This allowed him to conceal his ownership and control of the account and his involvement in the flow of currency through the account, in part by having Currency Transaction Reports showing cash deposits or withdrawals in amounts over ten thousand dollars ($10,000.00) filed under the false Social Security number rather than the Social Security number assigned to Rice.

7. In or about November 2008, Davis and Rice met with an undercover agent in the State of Nevada and discussed changing the method of laundering the proceeds represented to be the proceeds of bank fraud by wire transferring the currency after Defendant Shawn Rice had deposited it into his SIMPE account at J.P. Morgan Chase Bank to Davis's Boulder Mountain Funding Trust at

Wells Fargo Bank and then having Davis wire transfer the money to the undercover agent's financial account. Davis agreed to take a five percent (5%) commission of the money laundered as compensation for his services in laundering the bank fraud proceeds. Rice agreed to take a three percent (3%) commission of the money laundered as compensation for his services in laundering the bank fraud proceeds.

8.   Subsequently, in the State of Nevada, the undercover agent or a confidential human source acting at the direction of the undercover agent provided Rice cash proceeds represented to be the proceeds of bank fraud. Rice would take the cash proceeds and deposit them into his SIMPE account at J.P. Morgan Chase bank, account number XXXXX4312 and wire transfer the money minus any fee to Davis's account in the name of Boulder Mountain Funding Trust at Wells Fargo Bank, account number XXXXXX5202. Davis would then wire transfer the money minus any fee to the undercover agent's financial account in the State of Nevada.

9.   From March 2008 through on or about the date of this indictment, in the State of Nevada, the undercover agents and confidential human source, acting at the undercover agent's direction, provided Samuel Davis and Shawn Rice a total of approximately $1,293,782 in cash proceeds. Davis and Rice wire transferred back to the undercover agents approximately $1,198,000 by way of the undercover agents' financial account in the State of Nevada. Davis took a total of approximately $73,782 as fees for his services in laundering the bank fraud proceeds. Rice took a total of approximately $22,000 as fees for his services in laundering the bank fraud proceeds.

## V.

## WAIVER OF RIGHTS

1.   By entering a plea of guilty defendant is waiving, that is, giving up, certain rights guaranteed to defendant by law and by the Constitution of the United States. Specifically, defendant is giving up:

   a.   The right to proceed to trial by jury on the original charges, or to a trial by a judge if defendant and the United States both agree;

    b.  The right to confront the witnesses against defendant at such a trial, and to cross-examine them;

    c.  The right to remain silent at such trial, with such silence not to be used against defendant in any way;

    d.  The right, should defendant so choose, to testify in defendant's own behalf at such a trial;

    e.  The right to compel witnesses to appear at such a trial and to testify in defendant's behalf; and,

    f.  The right to have the assistance of an attorney at all stages of such proceedings.

        DANIEL G. BOGDEN  
        United States Attorney

        /s/  
        J. GREGORY DAMM  
        NICHOLAS D. DICKINSON  
        Assistant United States Attorneys  
        Organized Crime Strike Force